PLANTER, The (UNITED STATES v.). See Case No. 16,054.

## Case No. 11,208.

### PLANTERS' BANK v. ST. JOHN.

[1 Woods, 585.] [1]

Circuit Court, S. D. Alabama. Dec. Term, 1869.

STATE CITIZENSHIP—UNITED STATES—CIVIL WAR—EFFECT UPON PARTNERSHIPS—LOYALTY OF COPARTNER.

1. A citizen of the United States owes his first and highest allegiance to the general government, and not to the state of which he may be a citizen.

2. A citizen of one of the late insurgent states, who adhered to the cause of the United States and retired within the federal lines. and remained there during the Rebellion, continued to be a citizen of the United States, notwithstanding the secession and belligerency of his own state, and notwithstanding his purpose to return to that state after hostilities might cease.

3. A declaration of war or the commencement of actual hostilities between two states ipso facto dissolves the partnership relation existing between citizens of the hostile states.

4. Where a partnership consisted of three members, citizens of and doing business in one of the late insurgent states, and soon after the commencement of hostilities, one of the partners removed within the federal lines and adhered to the federal cause, and the other partners remained and assumed to continue the business in the firm name, their acts only bind themselves: the partnership is dissolved by the existence of hostilities between the sections and the relations of the partners as enemies.

5. Under such circumstances an agreement between the partners that the partnership shall continue is against public policy and void.

6. A dissolution of partnership by the fact of war renders express notice of the dissolution unnecessary.

The facts, as disclosed by the evidence, were substantially as follows: Before the

[1] [Reported by Hon. William B. Woods. Circuit Judge, and here reprinted by permission.]

late war of Rebellion the plaintiff was an incorporated bank, domiciled at Nashville, Tennessee, and St. John, Powers & Co., was a firm of private bankers doing business in Mobile, Alabama. The firm consisted of Newton St. John, Benj. Whitaker and Wm. G. Chandler, all of whom were resident citizens of Mobile. On the 29th of May, 1861, on account of the war which had then recently broken out, St. John removed with his family from Mobile, and went to New York City. In June of the same year he procured a passport from the department of state at Washington and went with his family to Europe, returning in the following November. After this he continued to reside in New York until October, 1865, when he returned to Mobile. St. John was opposed to the secession of the state of Alabama, and claimed that he adhered to the cause of the United States. When he went to New York, he left in Mobile valuable real estate. During his absence an unsuccessful attempt was made to confiscate his property as an enemy of the Confederate States. There was no formal dissolution of the firm of St. John, Powers & Co. The other partners continued to reside in Mobile and carried on the business in the firm name, and an attempt was made to show that this was with the concurrence of St. John. In January and February, 1862, the Planters' Bank of Tennessee sent for collection to St. John, Powers & Co., at Mobile, certain accepted drafts on citizens of Mobile, with the understanding assented to by St. John, Powers & Co., that the firm, for a compensation of one-forth of one per cent., should collect the amounts due on the drafts and remit the same to Nashville if the drafts were paid on presentment, if not so paid, that the drafts should be returned to the Planters' Bank upon demand. The sum due on these drafts amounted to $46,785. No part of this sum was ever paid by St. John, Powers & Co., to the Planters' Bank, and upon demand made, on March 2, 1866, for the drafts, they failed to deliver them to the bank. Wm. G. Chandler, one of the firm of St. John, Powers & Co., died in June, 1862. This action was brought against St. John and Whitaker, as surviving partners, to recover the amounts due on said drafts, with interest. Judgment by default was taken against Whitaker; St. John plead the general issue.

A. R. Manning and Percy Walker, for plaintiff.

Robert H. Smith and Thomas H. Herndon, for St. John.

WOODS, Circuit Judge (charging jury). The defendant, St. John, pleads the general issue. This puts the plaintiff upon proof of all the material averments of the declaration, and under it the defendant may show either that he did not promise, as alleged in the declaration, or may show any facts impeaching the validity of the promise, and,

with some few exceptions, not necessary here to be specified, may show any matter of defense which tends to deny his debt or liability. In order to maintain the issue on his part, the defendant St. John, not controverting the fact that prior and up to the 29th of May, 1861, he was and had been a member of the firm of St. John, Powers & Co., yet, claims that, at the date just mentioned, war having broken out and being then flagrant between the United States and the combination known as the Confederate States, he left the city of Mobile and the state of Alabama—went with his family beyond the military lines of the Confederate States, and within the lines of the United States. That he adhered, during the war, to the cause of the United States, continuing and maintaining his allegiance thereto, recognizing their authority, holding and claiming citizenship in the United States; that he remained beyond the Confederate lines and, except for a short interval, within the United States, and within their military lines, until the close of the war in 1865. That his partners, Whitaker and Chandler, remained in and carried on business in the city of Mobile, in the Confederate States, until the death of Chandler in July, 1862; and that, by reason of this state of facts, the partnership of St. John, Powers & Co. was dissolved before any obligation was incurred to the plaintiff; and that therefore, he, not being a partner in the firm at the time of the transactions with the plaintiff in January and February, 1862, is not liable. "It is a settled rule that when two nations or peoples are at war, all trade with the enemy, unless by permission of the government, is interdicted, and subjects the property engaged in it to confiscation." "The war puts every individual of the respective governments, as well as the governments themselves, in a state of hostility with each other. All treaties, contracts and rights of property are suspended. The citizens of the belligerent nations are, in all respects, considered as enemies. They have no power to sue in the courts of the enemy nation. Not only all trading, but all communication and intercourse with the enemy is forbidden." The Rapid [Case No. 11,-576]; s. c. 8 Cranch [12 U. S.] 155.

In a state of war, nation is known to nation only by armed exterior, each threatening the other with conquest or annihilation. The individuals who compose the belligerent states exist as to each other in a state of utter occlusion. If they meet, it is only to combat. The universal sense of nations has acknowledged the demoralizing effects which would result from the admission of individual intercourse. Every individual in one nation must acknowledge every individual of the other nation as his own enemy because the enemy of his country. The Rapid, 8 Cranch [12 U. S.] 155. See, also, The Julia, Id. 181. It has even been held that a debtor cannot make remittances to his creditor belonging to a nation at war with his own. Griswold v. Waddington, 16 Johns. 438. These rules of law were applicable to the citizens of the United States and of the seceding. states during the late war. It is therefore clear that a partnership could not continue between citizens of the United States and the Confederate States during the war. "The intercourse necessary between partners in the conduct of their business is cut off and forbidden by the laws of war, when the partners are citizens of belligerent nations. A state of war creates disabilities, imposes restraints and exacts duties altogether inconsistent with that relation. If one alien enemy could go on and bind his hostile partner by contracts in time of war, when the other can have no agency, consultation or control concerning them, the law would be as unjust as it would be extravagant." Griswold v. Waddington. supra. Whatever enriches the citizens of a state increases the power of the state to maintain war. It furnishes property for taxation from which the sinews of war are to be drawn. It is therefore utterly inconsistent with the laws of war that a citizen of one state should have capital employed, and devote his skill, knowledge and effort to a partnership business or adventure with the citizens of a hostile state. Such a connection and such an employment of capital would be giving aid and comfort to the enemy. Griswold v. Waddington, supra. See, also, Ouachita Cotton, 6 Wall. [73 U. S.] 521; Coppell v. Hall, 7 Wall. [74 U. S.] 542; McKee v. U. S., 8 Wall. [75 U. S.] 163; U. S. v. Lane, Id. 185.

I therefore instruct you that a declaration of war or the commencement of actual hostilities, which is equivalent thereto, between two nations ipso facto dissolves the partnership relation existing between citizens of the hostile states. You will therefore address yourselves to the inquiry, whether St. John, after the outbreak of the late war and before the transactions set out in the plaintiff's declaration, adhered to the United States, while Whitaker and Chandler adhered to the insurgent states. It is not disputed that up to the commencement of the war, St. John was a citizen of the United States as well as of the state of Alabama. He owed a paramount allegiance to the United States. To continue a citizen thereof he was not compelled to assume any new relation. It was only necessary for him to maintain the old one towards his government. If after the outbreak of hostilities he removed with his family beyond the military lines of the insurgent states, and put himself within the military lines of the United States; if he went not as an agent of the insurgent states, or in their service; if on arriving within the borders of the states adhering to the government of the United States, he acknowledged his allegiance to that government, by submitting to and obeying its laws, then I instruct you that he continued a

citizen of the United States, notwithstanding the state of which he had been a citizen was in armed insurrection against the government of the United States. He continued a citizen of the United States, notwithstanding he may have entertained a purpose at some future day, when hostilities should cease, of returning to the state of Alabama, and notwithstanding he left his property or a portion of it in the insurgent states. And to retain the character of a citizen of the United States it was not necessary for him to settle permanently within the military lines of the United States and without any intention of returning to the insurgent states. If he left the states in rebellion for the purpose of sojourning within the military lines of the United States, and not with any purpose to aid or assist the insurgent states, I charge you that so long as he remained within the lines of the United States, adhering to the United States, obeying their laws and acknowledging his allegiance to them, he was a citizen of the United States. If on the other hand Whitaker and Chandler continued to reside in the insurgent states, whether they engaged in rebellion or not, the simple fact of their residence made them in law enemies of the United States and of every citizen of the United States. Mrs. Alexander's Cotton, 2 Wall. [69 U. S.] 404.

If under these instructions you shall find that St. John continued a citizen of the United States, and Whitaker and Chandler continued to reside within the insurgent states, then St. John was the enemy of Whitaker and Chandler and they were his enemies, and this relation between them put an end to the partnership. Its continuance became illegal against public policy and the laws of war. It was unlawful for them to have any business relation the one party with the other; it was unlawful for them to hold any intercourse between them; all contracts between them became suspended during the war. In short, a continuous partnership became impossible. The partnership was dissolved by the condition of public affairs and the relation which the partners bore to each other as enemies. And this would be true even if the parties desired and consented that the partnership should continue. The partnership ceases because it is unlawful, because the laws of war forbid it, because the public safety which is the supreme law forbids it. And therefore, no acknowledgment by one partner or another can make or continue a partnership when the public law says that it cannot and shall not exist. If the law holds all partnerships in war, between citizens of the hostile states unlawful, it is not in the power of the parties to create or continue a partnership in defiance of law. Nothing can be plainer than the proposition that if the parties cannot lawfully form or carry on commercial business together during the war, every agreement for such a purpose would be null and void. Griswold v. Waddington, supra.

The public law and public policy forbidding the partnership relation between citizens of hostile states, it is not in the power of the partners to continue a partnership during war, by failing to give notice of its dissolution. A dissolution of partnership by the fact of war demands no notice to any person whatever to make it effectual as to all persons whomsoever. If the contrary doctrine were held, enemy partners might continue their partnership relation to a great extent in spite of public law and the public welfare, by a mere failure to give notice of its dissolution. Griswold v. Waddington, supra. If then you shall find from the proof and under the instructions I have given you, that St. John continued a citizen of the United States after the outbreak of the war, and his partners Whitaker and Chandler continued to reside within the limits of the insurgent states, then these facts dissolved the partnership which had existed between them without notice, and in spite of any agreement between them, if any such there was, that the relation should continue, and your duty in this case will end so far as St. John is concerned by a verdict in his favor. But if on the other hand you shall find that the defense set up by St. John is not made out, you will proceed, if the plaintiff has established the averments of the declaration to your satisfaction, to assess the damages.

You will determine in what amount the plaintiff has been damaged by the failure of defendants to pay over the money collected on the drafts, if any was collected, or to return the unpaid drafts on demand. The plaintiff is entitled to the money actually collected, with interest, and to the value of the bills unpaid and not returned, also with interest from the time demand was made for them. You will arrive at the value of the unpaid drafts by estimating from the evidence what amount could have been collected on them at the time they were sent for collection, deducting reasonable costs and charges for collecting. Whatever amount the plaintiff has shown could have been made upon the unreturned drafts, that you will allow as damages, with interest from the time demand was made for the return of the drafts.

Default has been taken against Whitaker. If you find for St. John, you will still assess the damages against Whitaker. If you find against St. John, you will assess the damages against both him and Whitaker.

The jury returned a verdict in favor of St. John and assessed the damages against Whitaker at $65,742.63.

See Philips v. Hatch [Case No. 11,094]; Montgomery v. U. S., 15 Wall. [82 U. S.] 395; Woods v. Wilder, 43 N. Y. 164.